# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CSX INSURANCE COMPANY, et al., | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 CV 2738 |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| PACIFIC RAIL SERVICES, LLC, | ) | |
| Defendant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PACIFIC RAIL SERVICES, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 CV 4185 |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| CSX INTERMODAL, INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case involves a crane that malfunctioned in September 2001, crushing to death its operator, Warren Kubicek, and causing significant property damage at the railyard where the crane operated. The company responsible for operating the crane and which employed Kubicek, Pacific Rail Services, has engaged in protracted litigation over the accident with the crane's owner, CSX Intermodal, Inc., as well as CSX Insurance Company (the court will use " CSX" when referring to either entity except where distinguishing between the two is necessary). A state court previously settled some of the disputed issues, and additional disputed issues were tried before this court without a jury.

Pursuant to Federal Rule of Criminal Procedure 52(a), and after carefully observing the trial and reviewing the transcript and trial exhibits, the court enters the following written findings

of fact and conclusions of law based upon consideration of all the admissible evidence, as well as the court's own assessment of the credibility of the trial witnesses.

## FINDINGS OF FACT

CSX owns and operates the Bedford Park railyard where Warren Kubicek worked as a crane operator. The railyard is known as an intermodal yard, meaning that workers operate large cranes to load cargo containers onto railroad flatcars. CSX entered into a Lift Services Agreement with Pacific Rail, under which CSX agreed to pay Pacific Rail to operate the crane and other equipment used to load and unload the cargo containers. The parties were operating under the Lift Services Agreement at the time of the incident that led to Kubicek's death.

### The Lift Services Agreement

Under § 5.1.3 of the Lift Services Agreement, CSX agreed to "maintain the Lift Equipment at CSXI's cost." Under § 5.1.4, Pacific Rail agreed to "complete a Lift Equipment inspection report at the beginning of each work shift" and to "deliver such reports to CSXI or, as designated by CSXI, CSXI's maintenance contractor each workday." CSX hired Central Intermodal to operate as its maintenance contractor.

Under § 9.1 of the Lift Services Agreement, Pacific Rail was required to obtain automobile and commercial general liability insurance naming CSX as an additional insured, as well as workers' compensation and employers' liability insurance. Section 9.1.2 detailed the specific commercial general liability insurance that Pacific Rail was required to purchase:

> 9.1.2 commercial general liability insurance, naming CSXI as an additional insured, covering bodily injury and property damage, arising out of exposures not covered by other insurance coverages, with a coverage limit of not less than $5,000,000 per occurrence and containing contractual liability coverage or an appropriate endorsement which will cover the obligations assumed by [Pacific Rail] under this Agreement;

Lift Services Agreement at 9.

Under § 9.4.1, Pacific Rail was obligated to indemnify CSX for, among other things, all liability, loss, damage, and attorneys' fees incurred as a result of the death of anyone, including Pacific Rail employees, as well as the loss, destruction of, or damage to property. Section 9.4.2 limits the extent of Pacific Rail's obligation to indemnify CSX as follows:

> 9.4.2  Contractor's [Pacific Rail's] indemnification shall extend, without limitation, to the defense of claims and actions alleging that an indemnified party's negligence, gross negligence, or willful misconduct was or might have been the sole or contributing cause of the subject indemnity event, but shall not extend to any judgement, award or settlement to the extent (on a comparative basis) it has been finally determined judicially or through arbitration, or agreed by the indemnified party, that the indemnified party's negligence, gross negligence or other tortious conduct was a cause of the indemnity event (each an "indemnity exception"). CSXI shall reimburse Contractor for the reasonable incremental costs incurred by Contractor in defending an indemnified party with respect to an indemnity exception.

Lift Services Agreement at 12.

Negligence on the part of CSX would not only limit its rights to be indemnified, but would also render inapplicable a release of liability provision found in the Lift Services Agreement. Specifically, under § 9.3, CSX is not liable for, and Pacific Rail releases all claims against CSX with respect to, "any injury to or death of persons or damage . . . caused (in whole or in part) by . . . the condition of any equipment or other property in, on or at the Terminal or storage yard," except "to the extent caused by the negligence or willful misconduct of CSXI."

### The Collapse of Crane 4087 and Its Maintenance History

Kubicek was an experienced crane operator, and had operated cranes for Pacific Rail since 1995. On September 8, 2001, he operated the crane he normally operated, crane 4087. Just before the accident, Kubicek was maneuvering crane 4087 from tracks 3, 4 and 5 to tracks 6 and

7. Fellow crane operator Mark McGrath witnessed parts of Kubicek's move to tracks 6 and 7. According to McGrath, as Kubicek began making the move to tracks 6 and 7, his crane behaved normally and traveled as its usual speed. Eventually, though, McGrath recalled seeing the left rear wheel of Kubicek's crane begin to buckle or break. McGrath also recounted seeking sparks come from the wheel and saw the wheel move towards the middle of the crane as the crane began to collapse.

Crane 4087 collapsed completely, meaning that the four columns that normally extended vertically toward the sky fell and landed in a horizontal position. Two side beams that are normally upright and to which the crane's wheels attach also fell and landed in a horizontal position. Employees of Mi-Jack, the company that manufactured crane 4087, had never seen any crane collapse in the manner that crane 4087 had collapsed. However, Mi-Jack crane 4187—a crane virtually identical to and manufactured at the same time as crane 4087—collapsed in 1989. The collapse of crane 4187 differed from the collapse of crane 4087 in that both side beams and three of the four vertical columns remained upright in the 1989 collapse, whereas all of the side beams and columns of crane 4087 landed in a horizontal position.

The 1989 collapse of Mi-Jack crane 4187 was caused by the failure of a turntable bearing, specifically a faulty weld on the bearing. As a result, much of the investigation into the collapse of crane 4087 focused on its turntable bearings. Turntable bearings attach each of crane 4087's wheels to the structure of the crane. The turntable bearings consist of an outer race, which is attached to the crane, and an inner race, which is attached to the wheel. The inner and outer races are held together by bearing balls. To prevent excessive wear, the bearing balls and raceways must be properly maintained by lubricating them. Failing to keep the bearing balls and raceways

properly lubricated allows moisture to penetrate the raceways, leading to corrosion. It can also result in metal-to-metal contact, which contributes to excessive wear. The corrosion and excessive wear caused by failing to keep the bearing balls and raceways properly lubricated can cause the raceway and bearing balls to become pitted. Pitting of the raceway and bearing balls leads to even more wear.

Investigators discovered that the left rear wheel turntable bearing on crane 4087 showed signs of wear. Specifically, the raceway and bearing balls were pitted and corroded. None of the original surface of the raceway of the left rear wheel remained and, in fact, the raceway had grown larger in diameter as a result of the original surface having been worn away. According to Lyndall Myers, the chief design engineer for Rotek (the turntable bearing's manufacturer), as the raceway grows larger due to wear, the turntable bearing can begin to wobble and become unsteady, making it unsafe to use.

The operations manual for crane 4087 states that "turntable bearings should be inspected for wear every three months or 750 hours." One way to inspect turntable bearings for wear is to perform a vertical deflection test. Although the accuracy of the tests has been questioned, they were the only tests of crane 4087's turntable bearings that Central Intermodal ever conducted. Central Intermodal was required to document all vertical deflection tests. Its practice was to record all vertical deflection tests in a log to create a permanent record that the test had been performed—there were no exceptions to the practice. According to Central Intermodal's log, the last vertical deflection test performed on crane 4087 occurred on November 1, 2000, 10 months before the crane collapsed. During that 10-month period of time, the crane had been in use for more than 4,000 hours. Frank Caminata testified at trial that he performed vertical deflection

testing on crane 4087 after November 1, 2000, but was impeached with his prior deposition testimony that he did not recall any vertical deflection tests being performed on crane 4087 after November 1, 2000, and that if he had performed such a test he would have logged it as required.

According to Central Intermodal's log for crane 4087, vertical deflection tests performed on new turntable bearings typically measured between .06 and .085 inches. The first vertical deflection test on the left rear wheel turntable bearing that was on crane 4087 when it collapsed was performed on May 24, 2000, and measured .100 inches. The November 1, 2000, test on crane 4087's left rear wheel turntable bearing measured a vertical deflection of .115 inches. When the vertical deflection reaches .140 inches, the turntable bearing must be replaced. The left rear wheel turntable bearing on crane 4087 was not replaced between the November 1, 2000, test and the crane's collapse on September 8, 2001.

The maintenance records that Central Intermodal maintained were owned by CSX and, therefore, CSX had the right to inspect them. However, CSX never checked those maintenance records and, therefore, never determined whether Central Intermodal was performing preventative maintenance or inspections. Indeed, CSX admits that its employees lacked any training or expertise in crane maintenance. Although Central Intermodal provided CSX with copies of all of the maintenance records for crane 4087, CSX found the records to be too voluminous to review and, in any event, the employee designated to receive the records lacked the training and expertise to throughly review the maintenance records.

## Previous Litigation and Settlement

Following the September 8, 2001, collapse that killed Warren Kubicek, his wife filed a wrongful death lawsuit in state court. The complaint alleged that CSX had been negligent for

failing to properly repair, maintain, and detect deficiencies in the repair and maintenance of the crane that malfunctioned. CSX tendered the defense of Kubicek's claim both to Pacific Rail under § 9.4.2 of the Lift Services Agreement, as well as to Pacific Rail's commercial general liability insurance carrier. Pacific Rail accepted the tender and spent $834,128.62 defending CSX.

In the meantime, CSX filed a third-party complaint against Pacific Rail in the state court proceeding seeking contribution. The third-party complaint alleged that Pacific Rail had been negligent for failing to properly train and supervise its employees and for failing to have them inspect equipment before using it. But CSX's third-party claim against Pacific Rail was short-lived. Pacific Rail filed a motion for summary judgment. CSX stated that it had no objection to the motion, and the state court granted it.

CSX and the other defendants ultimately settled the state court proceeding with the Kubicek estate. CSX's share of the settlement payment totaled $2,000,000. CSX then turned to Pacific Rail seeking to be reimbursed for $2,000,000 it paid to settle the state court proceeding. However, Pacific Rail's commercial general liability insurance carrier refused to reimburse CSX based upon a term in the policy that Pacific Rail had purchased that excluded coverage for a liability that arose from the fault or negligence of an additional insured.

Pacific Rail also refused to reimburse CSX, citing § 9.4.2 of the Lift Services Agreement under which Pacific Rail was not required to indemnify CSX to the extent "it has been finally determined judicially or through arbitration, or agreed by the indemnified party, that the indemnified party's negligence, gross negligence or other tortious conduct was a cause of the

indemnity event." Pacific Rail's position was that CSX had admitted its negligence by settling the claim of negligence brought by Kubicek's widow.

Pacific Rail has not only refused to indemnify CSX for the $2 million settlement payment, but has also demanded that CSX pay Pacific Rail $834,128.62, the amount that Pacific Rail paid to defend CSX in the state proceeding, as well as the $666,406.77 it spent to defend itself in state court. CSX refused to reimburse Pacific Rail for those defense costs.

### Instant Litigation & Trial

Following the resolution of the state court claims, Pacific Rail and CSX each filed separate lawsuits against the other in federal court. In case 07 CV 2738, CSX sued Pacific Rail alleging that Pacific Rail breached the Lift Services Agreement by: (1) obtaining a commercial general liability insurance policy that excluded coverage for CSX's negligence and that was issued by a carrier that was not authorized to do business in Illinois (Count I); and (2) failing to indemnify CSX (Count II).

In case 07 CV 4185, Pacific Rail sued CSX: (1) seeking a declaratory judgment that (i) CSX's negligence was responsible for the crane's collapse and Kubicek's death, (ii) CSX's settlement constitutes an admission under the doctrine of collateral estoppel that its negligence was responsible for the crane's collapse and Kubicek's death, (iii) CSX breached the Lift Services Agreement by failing to properly maintain the crane that collapsed, (iv) CSX must reimburse Pacific Rail the costs of defending CSX in state court, and (v) CSX must reimburse Pacific Rail for fees and costs incurred in the instant actions (Count I); (2) CSX breached the indemnity provision of the Lift Services Agreement by refusing to reimburse Pacific Rail for the

costs of defending CSX in state court (Count II); and (3) CSX breached the Lift Services Agreement by failing to maintain the crane that collapsed (Count III).

The court previously entered judgment in favor of CSX on Count I of its complaint, concluding that Pacific Rail had breached its obligation to procure insurance that would have covered CSX's negligence. However, at the time the court expressed no opinion about damages. The remaining claims were tried before the court.

At trial, in addition to their fact witnesses each party presented testimony from an expert witness who opined on the cause of the collapse of crane 4087. Pacific Rail offered the expert testimony of Edward Holmes, who has 40 years of experience and expertise in metallurgical science and failure analysis. Holmes opined that a lack of proper maintenance, including adequate lubrication, of the left rear wheel turntable bearing caused wear in the bearing. He further opined that when Kubicek turned the crane in order to move it to tracks 6 and 7, the left rear wheel bearing was subjected to a higher than usual load and, because of the wear to which the bearing had been subjected, it failed. Holmes testified that his opinion is further supported by fractures in the rear left wheel bearing that he observed during his post-collapse investigation.

CSX offered the expert testimony of Beldon Rich, who received a certificate of mechanical engineering and who has expertise in the field of hydraulics. Originally Rich concluded that a hydraulic leak did *not* cause the collapse of crane 4087. Instead, his original report attributed the crane's collapse to a defective left rear wheel bearing that had been improperly heat-treated by its manufacturer, Rotek, and had therefore been defective when it left the Rotek manufacturing facility.

However, following his deposition, he changed his mind, withdrew his original opinion, and submitted a revised opinion. According to his revised opinion and contrary to his initial assessment, crane 4087 collapsed as the result of a leak of 25 ounces of hydraulic fluid from the right steer cylinder, which caused the crane's right wheel to be pointed straight while the left rear wheel was turned inward. Rich testified that because the wheels were pointed in different directions, a "pincer movement" was created. It is Rich's opinion that the pincer movement created an intense lateral force to the side of the crane that eventually led to the collapse of the crane. Rich formed this opinion even though he found no physical evidence of any leak, such as the presence of hydraulic fluid on the crane or on the ground. He did, however, rely on pictures of a tire mark found near the right rear wheel, indicating to him that the left and right rear wheels were pointed in different directions at the time of the collapse.

Rich revised his opinion because he believed that a failure of the left rear wheel turntable bearing due to defective manufacturing did not explain the source of the intense lateral force required to have caused both side beams and all four of the crane's columns to collapse. In support, he notes that only one column and no side beams collapsed when crane 4187 collapsed in 1989 as a result of a turntable bearing that failed because of a faulty weld. For the same reasons, he believes that Holmes' opinion that the crane collapsed because of a turntable bearing failure caused by excessive wear does not explain the source of the force that caused all of the beams and columns to collapse.

**The Failure to Maintain the Crane's Turntable Bearings Led to the Crane's Collapse**

The court concludes that, based upon the evidence presented at trial and its observation of the testimony of witnesses, the facts support the conclusion that the collapse was the result of

worn bearings.  Specifically, Rich's opinion that the crane collapsed as the result of a hydraulic fluid leak is unsupported by any evidence of leaked fluid, such as fluid on the crane or on the ground.  Moreover, Rich merely surmised that the collapse must have been caused by a leak because only a leak would explain the resting position of the crane's beams and columns.

Additionally, the court takes into account the fact that initially Rich rejected the conclusion that a hydraulic leak had occurred.  Rich never explained what factors had led him to initially determine that no leak had occurred, and therefore the court is unable to determine whether any change in those factors justified Rich's revision of his opinion.

In contrast to the lack of support for Rich's opinion, Holmes' opinion is supported by the record.  Investigators found that the raceway and bearing balls in the left rear wheel turntable bearing were pitted and corroded, which are both signs of wear and inadequate lubrication.  In addition, the raceway had grown larger in diameter, a sign that the original surface of the raceway had been worn away.  Wear can lead the turntable bearing to wobble and become unsteady.  Although Central Intermodal monitored for unsteadiness caused by wear by performing vertical deflection tests on its cranes, it performed no tests on crane 4087 during the ten months preceding the collapse, even though the manufacturer recommended monitoring for wear once every three months.

A failed turntable bearing can lead a crane to collapse, as evidenced by the collapse of crane 4187 in 1989.  CSX has criticized Holmes' opinion by contending that it fails to account for the origin of lateral forces sufficient to have brought down all of the crane's beams and columns.  However, Holmes' opinion specifically attributes the lateral forces to the wear that had

occurred on the turntable bearing.  *See* Report of Edward W. Holmes, Pacific Rail Services Exhibit 106, at 1.

## CONCLUSIONS OF LAW

Having made the relevant factual findings, the court now turns to whether, based upon those facts, the parties are entitled to judgment on the claims they have alleged.

### I.  Pacific Rail's Complaint

### A.  Count I  (Declaratory Judgment)

At the outset, the court grants judgment to CSX on the portion of Count I of Pacific Rail's complaint that seek a declaratory judgment that CSX is collaterally estopped from denying its own negligence because it settled the state law proceeding in which negligence claims had been asserted against it.  As discussed more thoroughly in the court's order on the motions for judgment on the pleadings, Pacific Rail's argument that CSX is estopped from denying its own negligence because it settled the state court proceeding flies in the face of the long-held principle that an offer of settlement is not, by itself, an admission of liability.  Memorandum and Order dated August 20, 2008 [82-1] at 13; *see also* Fed. R. Evid. 408(a) (evidence of an offer to settle is inadmissible to establish liability).

The court also grants judgment to CSX on the portion of Count I that seeks a declaratory judgment that CSX breached the Lift Services Agreement by failing to maintain the crane.  That portion is wholly duplicative of Count III, which is addressed below.  *See F.D.I.C. v. Gravee*, 966 F. Supp. 622, 633 (N.D. Ill. 1997) (dismissing claim for declaratory judgment that was duplicative of claim for breach of contract).  CSX is also entitled to judgment on Pacific Rail's

request for a declaratory judgment that it is entitled to its attorneys' fees incurred in the instant action. Pacific Rail has identified no basis—contractual or otherwise—for awarding fees.

What remains of Count I is Pacific Rail's request for a declaratory judgment that (i) CSX's negligence in failing to maintain crane 4087 caused the crane to collapse and caused the death of Warren Kubicek, and (ii) as a result of that negligence, CSX must reimburse the costs that Pacific Rail incurred while defending CSX in state court. For the reasons that follow, Pacific Rail is entitled to judgment on each of these portions of Count I.

### CSX Negligently Failed to Maintain the Crane's Turntable Bearings

The parties have identified Florida law as the law that governs the construction of the Lift Services Agreement, but have not addressed what law governs the question of whether CSX negligently maintained the crane 4087. In the absence of any guidance from the parties, the court shall apply the law of Illinois, the state where the injury occurred. *See Cole v. Bell*, 09 CV 4832, 2009 WL 4730966, at *2 n.2 (N.D. Ill. Dec. 7, 2009) (under Illinois' choice-of-law analysis, law of the place of injury governs tort claims). Under Illinois law, CSX was negligent if it (1) had a legal duty, (2) breached that duty, (3) its breach proximately caused an injury, and (4) the injury caused damages. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 706 (7th Cir. 2009) (applying Illinois law).

The first factor is easily satisfied. CSX had two independent duties to maintain crane 4087. First, the Lift Services Agreement required it to "maintain the Lift Equipment at [CSX]'s cost. Lift Services Agreement § 5.1.3. *See Putman v. Village of Bensenville*, 786 N.E.2d 209, 211 (Ill. App. Ct. 2003) ("a defendant may be charged with negligence for failing to perform an

act required by a contract. . . . the scope of the duty is defined by the contract.")[1]  CSX argues

that the Lift Services Agreement imposed upon it only the duty to pay to have the crane

maintained, but its interpretation is at odds with the language used, which explicitly stated that

"[CSX] *will maintain*" the crane.  *Id.* (emphasis added).

     CSX also had the independent duty in tort to maintain the crane in a safe working

condition under Restatement (Second) of Torts § 343, as adopted by Illinois, under which:

> A possessor of land is subject to liability for physical harm caused to his invitees by a
> condition on the land if, but only if, he
>
> (a)     knows or by the exercise of reasonable care would discover the condition, and
>        should realize that it involves a unreasonable risk of harm to such invitees, and
>
> (b)     should expect that they will not discover or realize the danger, or fail to protect
>        themselves against it, and
>
> (c)     fails to exercise reasonable care to protect against danger.

*Field v. Norfolk & Western Railway Co.*, No. 97 CV 2788, 1998 WL 852877, at *3 (N.D. Ill.

Dec. 4, 1998) (applying Restatement (Second) of Torts § 343 to determine whether railyard

owner owed duty to warn independent contractor of a dangerous electrical panel, which

ultimately electrocuted one of the contractor's employees).  CSX should have known of the

unreasonable risk to Pacific Rail's employees who operated crane 4087 given that CSX never

checked the maintenance records provided to it by Central Intermodal in order to determine

whether the crane was being maintained.  The wear on the bearing balls and raceways was

concealed within the bearing itself and therefore, because an operator could not have observed

---

[1]The court acknowledges that under Illinois' *Moorman* doctrine, a plaintiff cannot recover
economic damages in tort for what is really a breach of a contract claim.  *See In re Chicago
Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997).  However the *Moorman* doctrine has no bearing on
the instant suit because the parties' claims do not sound in tort.

the wear, CSX had a duty to protect those operators that it had invited to operate the crane. *Id.*

(railway owner owes a duty to protect employees of subcontractor from hidden dangers on its

property).

The second factor is also easily satisfied. By hiring a subcontractor that did not properly

maintain the left rear wheel turntable bearing, and by failing even to review the maintenance

records submitted to it by the subcontractor, CSX breached that duty.

CSX attempts to deflect any responsibility for failing to maintain the crane by arguing

that by hiring a subcontractor to maintain the crane, it shielded itself from any liability for lack of

maintenance. In support, it notes that under Illinois law a general contractor is not derivatively

liable for the negligence of its subcontractors. *See Calderon v. Residential Homes of Am., Inc.*,

885 N.E.2d 1138, 1145 (Ill. App. Ct. 2008). However, CSX's argument is unavailing. As stated

explicitly in the Lift Services Agreement, the duty to maintain crane 4087 fell upon CSX.

Therefore, it is liable for the failure to fulfill that duty, not derivatively based upon Central

Intermodal's conduct, but rather for its own negligence. *See Aguirre v. Turner Construction Co.*,

582 F.3d 808, 810 (7th Cir. 2009) ("A general contractor who fails to fulfill that duty is liable if

injury results—not derivatively liable, as under respondeat superior, but liable for its own

negligent act or omission.") CSX affirmatively undertook the duty to maintain crane 4087 in the

Lift Services Agreement and, therefore, its failure to ensure that the crane was adequately

maintained was a breach of that duty.

The third and fourth factors have also been satisfied. As discussed more thoroughly

above, CSX's failure to properly maintain the rear left wheel turntable bearing proximately

caused the crane to collapse, and the collapse killed crane operator Warren Kubicek.

Accordingly, CSX's breach proximately caused an injury and the injury resulted in damages.

As a result, Pacific Rail is entitled to a declaratory judgment that CSX breached the Lift

Services Agreement by failing to maintain crane 4087, that its negligence was the cause of the

crane's collapse, and that it must reimburse Pacific Rail for the costs incurred in defending CSX

in state court.[2]

### B.     Count II  (Reimbursement of Costs to Defend CSX)

In Count II, Pacific Rail alleges that CSX breached its obligation under § 9.4 of the Lift

Services Agreement by failing to reimburse the costs Pacific Rail incurred defending CSX in

state court.  Pacific Rail demanded reimbursement on January 24, 2007.

Under § 9.4, CSX became obligated to repay defense costs "to the extent (on a

comparative basis) it has been finally determined judicially or through arbitration, or agreed by

the indemnified party, that the indemnified party's negligence, gross negligence or other tortious

conduct was a cause of the indemnity event."  As of January 24, 2007, no such final

determination had been made.  Moreover, given that no finding of negligence had occurred until

the release of this order, Pacific Rail could not have shown at trial that CSX had breached its

---

[2]The court acknowledges that in its August 20, 2008, order on the motions for judgment on the pleadings, it concluded that the portion of Count I seeking a declaratory judgment on the issue of reimbursement was wholly duplicative of Count II and therefore subject to dismissal. However, upon further reflection the court understands Count II to assert that CSX breached the Lift Services Agreement when it refused a demand to reimburse defense costs on January 24, 2007, a time at which there had no been determination that CSX was negligent.  In contrast, Count I seeks a declaratory judgment that CSX is obligated to reimburse those costs now, given that there is now a judicial determination of negligence.  Because the claims are not identical, the request for a declaratory judgment is not subject to dismissal.

obligation to repay defense costs.  Accordingly, CSX is entitled to judgment on this count.

**C.     Count III  (Reimbursement of Costs to Defend Pacific Rail)**

Consistent with the court's determination above that CSX failed to maintain crane 4087, Pacific Rail is entitled to judgment on Count III that CSX breached § 5.1.3 of the Lift Services Agreement, which required it to maintain the crane.  Pacific Rail contends that it spent $666,406.77 investigating and defending itself in the state wrongful death lawsuit as a result of CSX's breach, and seeks an award of damages in that amount.

In support of its request for damages, Pacific Rail cites § 9.3 of the Lift Services Agreement, which states in pertinent part as follows:

> 9.3     <u>Release of Liability</u>.  Neither CSXI nor any Affiliate . . . shall be liable for, and [Pacific Rail] hereby releases all claims, liabilities, demands, damages, losses, costs and expenses, including attorneys' fees and expenses, against CSXI and any Affiliate with respect to, any injury to or death of persons or damage to or loss of property arising from or in connection with or caused (in whole or in part) by the condition or use of any part of the Terminal or storage yard to the condition of any equipment or other property . . .  This release shall not extend to any injury to or death of person or damage to or loss of property to the extent caused by the negligence or willful misconduct of CSXI.

In light of the court's determination that CSX's negligence caused Kubicek's death, § 9.3 does not operate to release CSX from liability for its breach.

Under Florida's wrongful act doctrine, a plaintiff that incurred legal fees in a separate proceeding as the result of a defendant's wrongful conduct is entitled to recover those fees as compensatory damages.  *See Robbins v. McGrath*, 955 So. 2d 633, 634 (Fla. App. Ct. 2007) ("[W]here the wrongful act of the defendant has involved the claimant in litigation with others, and has placed the claimant in such relation with others as makes it necessary to incur expenses to protect its interests, such costs and expenses, including reasonable attorney's fees upon

appropriate proof, may be recovered as an element of damages.") (citing *Northamerican Van Lines, Inc. v. Roper*, 429 So. 2d 750, 752 (Fla. App. Ct. 1983)); *see also generally* Restatement (Second) of Torts § 914(2) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.").

CSX argues that Pacific Rail is nevertheless not entitled to recover the $666,406.77 it incurred in defense costs for three reasons. First, it contends that Pacific Rail is not entitled to recover its defense costs because, had it bought insurance to cover CSX's negligence, insurance would have covered all of Pacific Rail's defense costs. CSX's argument is beside the point because it is undisputed that Pacific Rail's insurance *did* cover all of the defense costs. *See* Response [142-1] to Statement of Fact 112.

Second, CSX argues that because Pacific Rail's insurer covered the defense costs, Pacific Rail is not entitled to recover those costs from CSX. However, CSX has cited no authority to support its contention that Florida's wrongful act doctrine does not apply when an insurer covers defense costs. By failing to support its contention with pertinent authority under Florida law, CSX has forfeited its argument. *See White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009).

Finally, CSX argues that Pacific Rail's insurer waived any right the insurer had to recover from CSX any of the defense costs the insurer paid. In support, CSX contends that the policy Pacific Rail obtained from its insurer contained a waiver of subrogation clause which prohibits the insurer from attempting to step into the shoes of Pacific Rail in order to assert a claim against

CSX to recover those defense costs.  Again, CSX's argument appears to be beside the point because Pacific Rail's insurer (a) is not a party to this case, and (b) has not asserted any claim against CSX in this case.

What matters is not what rights the insurer waived but, rather, what rights Pacific Rail agreed to waive.  As mentioned above, CSX has not cited any agreement between itself and Pacific Rail under which Pacific Rail promised not to seek to recover its own defense costs from CSX.  Instead, CSX contends that "[p]arties that waive insurer subrogation rights agree not to sue each other for damages insofar as they are covered by insurance."  *See* CSX's Statements of Facts and Conclusions of Law [141-1] Conclusion of Law 83.  But CSX supports its contention by citing cases that apply Illinois, not Florida, law.  Moreover, the cases are inapposite because in the agreements at issue in those cases, the parties agreed not only to obtain waivers of subrogation rights from their insurers, but also waived their rights to sue each other in the event that their losses were covered by insurance.  *See, e.g., Intergovernmental Risk Mgt. ex rel. Village of Bartlett v. Odonnel, Wicklund, Pigozzi & Peterson Architects, Inc.*, 692 N.E.2d 739, 741 (Ill. App. Ct. 1998) ("The Owner and Contractor waive all rights (1) against each other . . . to the extent covered by property insurance . . .").  CSX has cited no similar agreement between it and Pacific Rail.

Accordingly, Pacific Rail is awarded compensatory damages in the amount of $666,406.77, the cost of defending it in the state court wrongful death proceeding.

## II.     CSX's Amended Complaint

### A.     Count I  (Failure to Procure Insurance)

The court previously entered judgment in favor of CSX on its claim that Pacific Rail breached the Lift Services Agreement by failing to procure insurance that covered CSX's negligence.   As a consequence of that breach, CSX was damaged in the amount of $2 million, its portion of the amount paid to settle the state wrongful death lawsuit brought by the estate of Warren Kubicek.  Pacific Rail does not dispute the reasonableness of the $2 million settlement payment.  Accordingly, judgment is entered in favor of CSX in the amount of $2 million.

The court notes that CSX is also entitled to damages for its "legal costs and expenses," both under § 14.2 of the Lift Services Agreement, as well as under Florida law since the insurance coverage that Pacific Rail failed to purchase would have necessarily covered CSX's defense costs.  *Doe v. Allstate Ins. Co.*, 653 So.2d 371, 373 (Fla. 1995).  However, even though CSX is entitled to those costs under Count I of its complaint, it must reimburse Pacific Rail those same costs under Count I of Pacific Rail's complaint.  Accordingly, the awards offset each other.

CSX argues that under § 14.2, it is also entitled to interest in the amount of 18% per annum on "all expenses," which it contends includes not only its legal costs and fees but also the underlying award of $2 million.  Pacific Rail advances a much more restrictive interpretation of § 14.2's use of the phrase "all expenses," which it contends provides for interest only on legal expenses, not the underlying award.

The court begins by reviewing the language of § 14.2, which reads as follows:

14.2     <u>Liability for Expenses</u>.  With any Event of Default by Contractor, Contractor shall
be liable to CSXI for:

(a) all expenses (including, but not limited to, legal costs and expenses and attorneys', expert witness, and paralegal' fees, including, but not limited to, fees and costs incurred for appellate or bankruptcy proceedings)

(i) incurred by CSXI in curing or seeking to cure such default or in exercising or seeking to exercise any of CSXI's rights and remedies with respect to such default, or

(ii) otherwise arising out of such default, plus

(b) interest on all such expenses, at the rate of eighteen percent (18%) per annum,

all of which expenses and interest will be due and payable by Contractor to CSXI upon written demand.

Lift Services Agreement § 14.2 (put into outline form for clarity).

When viewed in context, the court agrees that § 14.2's use of the term "all expenses (including, but not limited to, legal costs and expenses and attorneys', expert witness, and paralegals' fees . . .)" refers only to typical litigation expenses. Even though the prefatory phrase "including but not limited to" signals that the list that follows is merely exemplary, not exclusionary, the list nevertheless impacts the interpretation of "all expenses." For instance, in *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1088 (Fla. 2005), the Florida Supreme Court interpreted an insurance contract that excluded coverage for any loss "caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, rising or shifting." The court interpreted the exclusion consistent with the rule of *ejusdem generis,* under which "general words are construed as applying to the same kind or class as those that are specifically mentioned." *Id.* at 1089. Under that rule, the Florida Supreme Court concluded that "earth sinking, rising or shifting" that

had been caused by blasting was not an excluded loss because the other examples of earth movement given—"earthquake, landslide, mudflow"—were natural, not man-made, events.

As applied to this case, the rule of *ejusdem generis* requires that "all expenses" be interpreted consistent with the kind or class of expenses enumerated, which are all typical litigation expenses. Accordingly, CSX is entitled to interest on only those expenses that it incurred in prosecuting its claim, not on the underlying $2 million damage award.

## B.    Count II  (Failure to Indemnify)

In Count II, CSX alleges that Pacific Rail breached § 9.3 of the Lift Services Agreement by failing to indemnify CSX for the $2 million settlement payment and the $1.5 million cost to replace crane 4087. As discussed above, CSX is not entitled to indemnification under § 9.3 because the collapse of crane 4087 was the result of its own negligence. Accordingly, judgment is entered in favor of Pacific Rail on Count II.

## CONCLUSION

For the reasons stated above, judgment is entered as follows:

### Case 07 CV 4185  (Pacific Rail v. CSX)

| | |
|---|---|
| **Count I** | (a) judgment is granted to CSX on Pacific Rail's request for a declaratory judgment that (ii) CSX is estopped from denying its negligence, (ii) CSX breached the Lift Services Agreement by failing to maintain the crane, and (ii) CSX is liable for attorneys' fees that Pacific Rail incurred in the instant litigation, |
| | (b) judgment is granted to Pacific Rail on its request for a declaratory judgment that (i) CSX's negligence caused crane 4087 to collapse and the death of Warren Kubicek, and (ii) Pacific Rail is entitled to be reimbursed for the costs to defend CSX in the state court wrongful death proceeding; |
| **Count II** | judgment is granted to CSX on Pacific Rail's claim that CSX breached its obligation under § 9.4 of the Lift Services Agreement to reimburse Pacific |

Rail for the costs to defend CSX in the state court wrongful death proceeding;

**Count III**        judgment is granted to Pacific Rail on its claim that CSX breached its obligation under § 5.1.3 of the Lift Services Agreement to maintain the crane, and it is awarded compensatory damages in the amount of $666,406.77;

**Damages**        Pacific Rail is awarded $666,406.77 in compensatory damages under Count III of its amended complaint for the costs to defend it in the state wrongful death proceeding; the award of attorneys' fees to which Pacific Rail is entitled under Count I of its amended complaint is offset by the attorneys' fees that it must reimburse CSX under Count I of CSX's complaint.

## Case 07 CV 2738  (CSX v. Pacific Rail)

**Count I**        judgment is granted to CSX on its claim that Pacific Rail failed to procure insurance that covered CSX's negligence; and

**Count II**        judgment is granted to Pacific Rail on CSX's claim that Pacific Rail failed to indemnify it.

**Damages**        CSX is awarded $2 million under Count I of its complaint; the award of attorneys' fees to which CSX is entitled under Count I of its complaint is offset by the attorneys' fees that it must reimburse Pacific Rail under Count I of Pacific Rail's amended complaint.

To the extent that any party is entitled to fees, costs, or interest consistent with this judgment, the parties shall comply with the requirements of Local Rule 54.3.

ENTER:

DATE:  February 26, 2010

*Blanche M. Manning*

Blanche M. Manning
United States District Judge